## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **PAMELA S.,**[1] | ) | |
| | ) | **No. 20 CV 607** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **KILOLO KIJAKAZI, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | **April 21, 2022** |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Pamela S. seeks disability benefits asserting that she is disabled by cerebrovascular accident, chronic sinusitis/rhinitis, and hypertension. Before the court are the parties' cross motions for summary judgment. For the following reasons, Pamela's motion is denied, and the government's is granted:

## Procedural History

Pamela filed her applications for benefits in November 2016 alleging that she has been disabled since October 21, 2016. (Administrative Record ("A.R.") 15, 228-41.) Her applications were denied initially and upon reconsideration. (Id. at 15, 137-52, 155-72.) She sought and was granted a hearing before an Administrative Law Judge ("ALJ"). (Id. at 15, 197-98, 202-04.) After a hearing in July 2018 at which Pamela appeared with her attorney and a vocational expert ("VE"), (id. at 60-136), the ALJ ruled in November 2018 that she was not disabled, (id. at 12-30). The

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect her privacy to the extent possible.

Appeals Council denied Pamela's request for review, (id. at 1-6), making the ALJ's decision the final decision of the Commissioner, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Pamela then filed this lawsuit seeking judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 10).

## Facts

Pamela, a college graduate, worked as a school aide, childcare provider, jewelry salesperson, child welfare attendant, and insurance salesclerk before her alleged disability. (A.R. 20, 73, 78, 81, 267, 205.) In October 2016 she suffered a mild stroke, resulting in vision and balance issues, numbness, inability to use her left arm and hand, anxiety, and fatigue. (Id. at 20, 266, 275.) She also suffers from type-2 diabetes and high blood pressure. (Id. at 20, 266.) Pamela says she can walk 10-15 feet before needing to rest, pay attention "for an average length of time," and is limited in her ability to lift, squat, bend, reach, walk, kneel, climb stairs, see, concentrate, and use her hands. (Id. at 280.) She submitted documentary and testimonial evidence to support her disability claims.

## A. Medical Evidence

In October 2016 Pamela was walking with her mother when she began to feel dizzy. (A.R. 463.) After continuing to experience dizziness and blurred vision, she saw her doctor on October 25, 2016, and was then sent to the emergency department. (Id. at 333, 463-64, 480, 522.) At the hospital she walked with an unsteady gait. (Id. at 335, 337.) She complained of blurred vision, commenting that it seemed "like there [wa]s a film over both eyes." (Id. at 340, 343, 380.) An MRI of

the brain showed an "[a]cute infarct involving the posterior limb of internal capsule on the right extending slightly anterior within the mesial aspect of the right temporal lobe." (Id. at 344, 539, 578, 580.) An MRA of the head and neck revealed "[r]ight proximal PCA P1 segment mild to moderate stenosis," but the remainder of the scan was unremarkable. (Id. at 399, 552, 554, 556.) Hospital records note that she was diagnosed with type-2 diabetes and hypertension a "few weeks" before suffering her stroke. (Id. at 341, 345-46, 377, 414, 592.)

During her hospital stay, Pamela reported decreased functioning in her left arm and hand, stating she could not get "a good grip" when picking up items. (Id. at 388.) But her hand strength and coordination improved several days later. (Id. at 355-56.) Pamela expressed difficulty concentrating during a speech pathology examination but was noted to have fully "intelligible, fluent speech" and to be "[a]ble to write biographical information with 100% accuracy," although she had "increased processing time" when writing out numbers. (Id. at 357; see also id. at 374.) During a neurological examination, Pamela reported that her vision on the left side was "a little bit" worse and that she continued to experience dizziness. (Id. at 375 (quotations omitted).) She had "decreased visual acuity," "subtle left mouth droop," and fully intact gait with one person helping her. (Id. at 380, 390.)

Pamela was discharged from the hospital on November 3, 2016. Her discharge records show that she was treated for dizziness, essential hypertension, stroke, type-2 diabetes, and blurry vision. (Id. at 340.) Her mental status was "normal" and her cranial nerves and sensation were intact. (Id. at 347.) Her

muscle strength was "5/5 in upper extremities, 5/5 in lower extremities," and she had "[n]o facial droop," "slurred speech," or tremors. (Id.) She walked 300 feet without an assistive device but had a "wide base[]" and "veer[ed] to the left." (Id. at 416, 419.) Pamela was anxious about being discharged because she could not dress herself and was concerned about caring for herself. (Id. at 333.) She was referred for acute rehabilitation, but her insurance declined to cover this treatment. (Id. at 338, 613.)

One day after her discharge, Pamela fell at home. She reported to another emergency department complaining of "dizziness, difficulty walking, and blurry vision." (Id. at 610, 620, 637.) An MRI of the brain showed "[s]table appearance subcortical right side infarction." (Id. at 601-02.) On examination she had normal gait, strength, and range of motion, and "[n]o cranial nerve deficit or sensory deficit." (Id. at 611; but see id. at 619 (noting "extreme difficulty" with gait and "gait unsteadiness").) She was admitted for inpatient rehabilitation, which resulted in "some improvement." (Id. at 620-21, 629.) Upon discharge six days later, Pamela had an "unsteady" and "[w]ide based" gait, her motor strength was 4+/5 on the left side and 5/5 on the right side, her sensation was normal to light touch, and reflexes were 2+." (Id. at 629.) Acute rehabilitation was recommended on discharge, but Pamela's insurance once more declined to cover this treatment. (Id.)

About two months later, Pamela again went to an emergency department complaining of blurry vision, dizziness, and left arm weakness. (Id. at 721.) She was admitted for three days this time. (Id.) Another MRI of the brain revealed a

"late subacute infarction of the posterior limb of the right internal capsule." (Id. at 722.) During this hospital stay, her vision improved slightly, dizziness dissipated, and blood pressure medication was increased. (Id. at 722, 1037.) Discharge records do not reflect any new neurological issues, dysmetria, or pronator drift and show full strength bilaterally, intact sensation, 2+ reflexes, and normal gait. (Id. at 752, 1033, 1036.)

Pamela also suffers from hypertension, high cholesterol, hyperlipidemia, and diabetes. (Id. at 1111, 1123, 1166, 1182, 1186, 1235, 1238.) In May 2017 she underwent septoplasty and turbinate reduction because of chronic sinusitis and rhinitis. (Id. at 1146, 1150, 1166.) In April 2018 Pamela was diagnosed with anxiety disorder and referred for behavioral health treatment. (Id. at 1115, 1137.)

## B. Hearing Testimony

Pamela testified at the hearing that from 2013 to 2016 she worked as a teacher but stopped working in October 2016 after suffering a stroke. (A.R. 72, 75-77.) She was hospitalized for a week and then, after being released, she was readmitted because she fell. (Id. at 103.) Her treating providers recommended therapy after the stroke, but Pamela's insurance denied coverage. (Id. at 89.)

In terms of her limitations, Pamela said she has difficulty walking because of balance issues, and she needs to stop and take breaks and rest if she needs to walk longer than two blocks. (Id. at 71-72.) She does not use a cane. (Id. at 72.) She also has difficulty reading because the stroke impairs her vision, (id. at 109, 117-18 (describing her blurriness as a "constant[]" state of "cloud[iness]")), and her ability

to hold items in her left hand, (id. at 92, 95, 120-22). She continues to experience pressure in her head and "dizzy spells," which are intermittent but can occur twice a week and last an entire day. (Id. at 104, 119-20.) She testified that her stroke also affects her focus, concentration, and memory. (Id. at 123.) Even with these limitations, Pamela—who lives with her mother—shops for groceries, drives her mother and herself to medical appointments, cleans, and cares for her mother. (Id. at 66, 68, 107.)

A VE testified at the hearing and described Pamela's past relevant work as: (1) school childcare attendant, medium work; (2) tutor, light work; (3) jewelry salesperson, light work; and (4) school childcare attendant/nursery school attendant, light work but performed at the medium exertional level. (Id. at 127-31.) The ALJ then posed hypotheticals to the VE regarding whether someone with a specific residual functional capacity ("RFC") and Pamela's age, education, and past jobs could perform her past work. One hypothetical concerned an individual with an RFC for light work and exertional limitations including having visual disturbances and dizzy spells, avoiding working at hazardous unprotected heights and with hazardous machinery, and frequently negotiating stairs, machines with open areas, conveyers, parts that can engage the body, and blades or combustible parts. (Id. at 131.) The VE testified that a person with such an RFC could perform Pamela's past work as a jewelry salesperson and nursery school attendant, as those jobs are typically performed. (Id. at 131-32.)

**C.     The ALJ's Decision**

The ALJ engaged in the standard five-step evaluation process in considering Pamela's claims for benefits.  *See* 20 C.F.R. § 404.1520(a).  At step one the ALJ determined that Pamela had not engaged in substantial gainful activity between her disability onset date and the date of the ALJ's decision.  (A.R. 18.)  At step two the ALJ found that Pamela suffers from severe impairments of cerebrovascular accident, chronic sinusitis/rhinitis, and hypertension, and non-severe impairments of diabetes, high cholesterol, and headaches.  (Id.)  At step three the ALJ determined that Pamela's impairments were not of listings-level severity.  (Id. at 18-19.)

Before turning to step four, the ALJ found that Pamela has the RFC to perform light work with specific exertional limitations.  (Id. at 19.)  In explaining this RFC, the ALJ pointed to objective medical evidence, including diagnostic images and examinations, treatment for Pamela's impairments, and opinion evidence.  (Id. at 21-24.)  The ALJ concluded at step four that Pamela could perform her past relevant work as a jewelry salesperson and nursery school attendant, as those jobs are generally performed.  (Id. at 25.)  In so finding, the ALJ relied on the VE's testimony that such work requires only light exertion.  (Id.)  Accordingly, the ALJ denied Pamela's claims for benefits.  (Id. at 26.)

## Analysis

Pamela claims that the ALJ erred by: (1) improperly assessing her RFC; (2) not giving controlling weight to her treating physician's opinion; (3) wrongly

discounting her symptom allegations; and (4) incorrectly determining that she could perform past work. (R. 22, Pl.'s Br.) When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and whether the decision has the support of substantial evidence. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This is a deferential standard that precludes the court from reweighing the evidence or substituting its judgment for that of the ALJ's, allowing reversal "only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted).

**A.    RFC Assessment**

Pamela argues that the ALJ's RFC assessment lacks the support of substantial evidence. (R. 22, Pl.'s Br. at 8-11.) The RFC measures the maximum a person can do despite her limitations and must be based on "all the relevant evidence" in the record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In assessing a claimant's RFC, the ALJ "must give substantial weight to the medical evidence and opinions submitted, unless specific, legitimate reasons constituting good cause are shown for rejecting it." *Chambers v. Saul*, 861 Fed. Appx. 95, 101 (7th Cir. 2021) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995) (quotations omitted)). A flawed RFC assessment will not justify remand unless the claimant can identify additional limitations not already included

in the RFC. *See Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021); *Jozefyk*, 923 F.3d at 498.

Here, the ALJ "canvassed the medical evidence and fully accounted for" Pamela's limitations supported by the record. *Cervantes v. Kijakazi*, No. 20-3334, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021). The ALJ discussed Pamela's severe impairments of stroke, chronic sinusitis/rhinitis, and hypertension and non-severe impairments of diabetes, high cholesterol, and headaches, and he explained why objective medical evidence shows she can perform light work with exertional limitations. The ALJ reviewed the medical evidence showing that Pamela suffered a stroke in October 2016, which caused blurred vision, dizziness, left hand numbness and weakness, frontal head pressure, and unsteadiness. (A.R. 21.) He noted that Pamela was admitted to the hospital and that she was able to walk 300 feet, albeit with a wide-based gait, after inpatient therapy. (Id.) The ALJ also observed that, shortly after being discharged, Pamela was admitted again with dizziness, blurred vision, left facial droop, left arm drip, left arm ataxia, and altered light touch sensation. (Id.) The ALJ recognized that Pamela demonstrated improvement with inpatient therapy and was discharged with wide-based gait, 4+/5 left-side motor strength, 5/5 right-side motor strength, 2+ reflexes, and normal sensation to light touch. (Id. at 21-22.)

The ALJ considered Pamela's January 2017 visit to the emergency department complaining of blurred vision, fogginess, dizziness, and left arm weakness. (Id. at 22.) But he noted that on examination Pamela had "no new

neurological defects," 4/5 left upper extremity motor strength, and intact sensation, and that on discharge she had "full motor strength bilaterally, intact sensation to light touch, 2+ reflexes," and no pronator drift. (Id.) The ALJ also considered Pamela's consultative examination performed later that month, in which she walked 50 feet on her own and had a negative straight leg raise test, full range of motion and grip strength, and normal sensation and gait. (Id.) The ALJ then observed that in the following month Pamela continued to experience dizziness as "a residual effect" from her stroke, but she "could walk without much difficulty and without any assistance." (Id. at 23.)

The ALJ took into account the impact Pamela's chronic sinusitis/rhinitis had on her ability to work. He noted that in March 2017 Pamela reported sinus pain and pressure, nasal congestion, headaches, and sneezing that did not improve with sprays and medication. (Id.) He recognized that Pamela's provider ordered a CT scan of her sinuses, which revealed "hypertrophy of turbinates and nasal septal deviation," and then recommended surgery. (Id.) The ALJ noted that Pamela underwent septoplasty and turbinate reduction in May 2017, and subsequent examinations showed "minimal caudal septal edema on the left with no nasal discharge, normal external nose, and no intracranial masses or polyps." (Id.) And although the ALJ cited Pamela's continued reports of left nostril congestion, he highlighted that the records show medication noncompliance. (Id.)

The ALJ further discussed medical evidence showing that Pamela had "permissive hypertension," without "signs of end organ damage" or "evidence of

10

atrial fibrillation." (Id. at 21.) While Pamela was admitted to the hospital in February 2017 with "uncontrolled hypertension and chest pain," the ALJ noted that she underwent a brain CT scan, chest x-rays, and a stress echocardiogram and was discharged the same day with no treatment changes. (Id. at 22.) He also cited a March 2018 office visit in which Pamela's hypertension was reported as "poorly controlled," and the treating physician's note that Pamela was not compliant with medication. (Id. at 23.) The ALJ observed that "despite elevated blood pressure readings" and reports of "uncontrolled" hypertension, "diagnostic imaging and exams were unremarkable." (Id. at 24.) Nevertheless, the ALJ discounted the state agency physicians' opinions because they "failed to consider the effects of [Pamela]'s hypertension, which required medication management to control her high blood pressure and contributed to her dizziness and headaches." (Id.) And when assessing her RFC, the ALJ considered hypertension in finding Pamela capable of light work with exertional limitations. (Id. at 25.)

Finally, the ALJ considered the opinion evidence, noting at the outset that neither the consultative examiner who evaluated Pamela, nor the state agency physicians who reviewed her medical records, endorsed any restrictions in Pamela's ability to work. (Id. at 23-24.) The ALJ partially credited the consultative examiner's opinion that Pamela "had no difficulty in standing, bending, sitting, hearing, lifting, carrying, speech, gait, fine manipulation and handling small objects." (Id. at 23 (citing id. at 778).) The ALJ noted that the consultative examiner personally examined Pamela, and the opinion was consistent with

objective medical evidence. (Id.) But the ALJ discounted it to the extent it was "vague" and lacked a "function-by-function" assessment of limitations. (Id.) Similarly, while the state agency physicians agreed with the consultative examiner's findings, the ALJ found Pamela more limited based on other evidence in the record, including her complaints of dizziness, left-side weakness, and abnormal examination findings. (Id. at 23-24.) The reasoning the ALJ provided is sufficient to satisfy the "minimal[] articulat[ion]" standard for discounting non-treating source opinions. *Grotts v. Kijakazi*, 27 Fed.4th 1273, 1277 (7th Cir. 2022).

Likewise, the ALJ evaluated treating physician Dr. Mehak Sethi's opinion that Pamela's pain, fatigue, and symptoms were sufficiently severe "to interfere with attention and concentration occasionally" and that she was limited to work that permitted shifting positions at will from sitting, standing, and walking. (A.R. 24.) The ALJ discounted the opinion evidence because it was inconsistent with objective medical evidence. (Id. at 23-24.)

Pamela insists that the ALJ erred in assessing the RFC because he "impermissibly split the difference between offered opinions . . . without pointing to record evidence to support" the RFC, thereby creating an "evidentiary deficit." (R. 29, Pl.'s Reply at 2.) It is true that the ALJ afforded only "limited" and "little" weight to the consultative examiner's and state agency physicians' opinions, respectively, and only "slight weight" to Dr. Sethi's opinion. (R. 22, Pl.'s Br. at 8.) But the ALJ has the "final responsibility" for assessing a claimant's RFC and "need not adopt any one doctor's opinion." *Fanta v. Saul*, 848 Fed. Appx. 655, 658 (7th

Cir. 2021) (quotations and citation omitted).  Moreover, as the Seventh Circuit instructed in *Vang v. Saul*, 805 Fed. Appx. 398, 401-02 (7th Cir. 2020), the ALJ must "consider all limitations supported by [the] record evidence" and "tie the record evidence to the limitations included in the RFC finding."  But he need not match RFC conclusions item-by-item with medical opinions.  *See David C. v. Kijakazi*, No. 20 CV 3891, 2022 WL 602520, at \*10 (N.D. Ill. March 1, 2022); *Michael B. v. Berryhill*, No. 18 CV 236, 2019 WL 2269962, at \*6 (N.D. Ill. May 28, 2019).  Here, the ALJ did not create a "middle ground" opinion but rather weighed the evidence and connected it to each RFC limitation.

Pamela also complains that the ALJ merely summarized certain evidence instead of adequately analyzing it—and she presents a litany of questions, asking for example how the ALJ could have reached his conclusion given her subjective reports of left-side weakness, blurry vision, and dizziness—to suggest a need for greater RFC limitations.  (R. 22, Pl.'s Br. at 9.)  As explained, the ALJ sufficiently grappled with the evidence and accounted for the limitations supported by the record.  In any event, Pamela did not "identify what specific additional restrictions the evidence establishes"—a "shortcoming" that is "fatal" to her argument. *Cervantes*, 2021 WL 6101361, at \*3.

Pamela further alleges that the ALJ ignored several impairments.[2]  (R. 22, Pl.'s Br. at 10.)  As to her non-severe impairments, the ALJ cited lab results

---

[2]  Pamela asserts that the ALJ was required to account for her anxiety in the RFC. (R. 22, Pl.'s Br. at 10.)  She offers no analysis to support this argument and, as such,

showing Pamela had elevated blood sugar levels and high cholesterol. (A.R. 18.) He also cited treatment records and Pamela's own testimony showing that the conditions were managed with medications and "no aggressive treatment" had been "recommended or anticipated." (Id.) When assessing Pamela's RFC, the ALJ also accounted for limitations caused by visual disturbances and dizziness resulting from her conditions. (Id. at 25.) Accordingly, the ALJ did not err in assessing the RFC.

## B.    Symptom Evaluation

Pamela asserts that the ALJ's decision to discount her subjective symptom allegations lacked the support of substantial evidence. (R. 22, Pl.'s Br. at 12-18.) An ALJ's symptom evaluation is entitled to great deference because of the ALJ's ability to observe firsthand the believability of the claimant's symptom descriptions. *See Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). As such, a reviewing court may reverse a symptom assessment only where it is "patently wrong." *Id.* at 816. The court will not disturb an ALJ's evaluation of a claimant's symptom description if it is logically based on specific findings and evidence in the record. *See id.* at 815. "[A]lthough ALJs do not need to address every piece of evidence in the record, an ALJ may not ignore an entire line of evidence contrary to its ruling." *Grotts*, 27 F.4th at 1278.

Pamela contends that the ALJ used the incorrect "not entirely consistent" standard of review to evaluate her symptom statements. (R. 22, Pl.'s Br. at 13-14 (citing A.R. 20-21).) However, courts have rejected the "not entirely consistent"

---

she forfeits it. *See Krell v. Saul*, 931 F.3d 582, 586 n.1 (7th Cir. 2019) (noting that perfunctory arguments are forfeited).

argument where the ALJ's analysis tracks the correct standard of determining whether medical and other record evidence substantiates the symptom statements. *See Harris v. Saul*, 835 Fed. Appx. 881, 886 (7th Cir. 2020). Here, in assessing the severity of Pamela's symptoms, the ALJ appropriately considered the applicable factors, including objective medical evidence, treatment efficacy, and daily activities, and made specific findings to support with substantial evidence his evaluation of her subjective symptom allegations. (A.R. 24-25.)

Pamela nonetheless argues that the ALJ's symptom assessment was deficient because he "merely summarized" objective medical evidence and did not explain how it undermined her symptom allegations. (R. 22, Pl.'s Br. at 13-14.) The ALJ's decision belies her argument. For example, as to Pamela's allegations that she is unable to work because of blurred vision, dizziness, and left-side weakness from her stroke, the ALJ examined the record and pointed out how objective evidence contradicts this assertion. (A.R. 21-25.) In particular, the ALJ cited treatment records demonstrating the "mild" nature of her stroke and her improvement with therapy. (Id. at 21, 24.) The ALJ also discussed how examination findings showing "normal gait, full upper and lower extremity motor and muscle strength, and intact sensation to the extremities," are inconsistent with allegations of continued left-side weakness. (Id. at 21-24.)

Pamela also takes issue with the ALJ's finding that her health symptoms improved with medication. (R. 22, Pl.'s Br. at 14.) She suggests the record indicates otherwise as to her hypertension. (Id.) But the ALJ fairly represented the

record. The ALJ cited a January 2018 treatment record reflecting that Pamela's "episodic dizziness, headache, facial numbness, and diaphoresis" were likely related to "poorly controlled hypertension or episodic rise in blood pressure." (A.R. 23 (citing id. at 1231).) The ALJ also cited a March 2018 record noting her "blood pressure remains poorly controlled" and that she was not compliant with medication. (Id. (citing id. at 1233).) The ALJ then observed that, a month later and after complying with medication, Pamela's provider noted that her blood pressure was "better controlled." (Id. (citing id. at 1236).) The ALJ also cited records showing Pamela had "no signs of end organ damage" as a result of her hypertension, and "an EKG showed no evidence of atrial fibrillation." (Id. at 21.) Given the record evidence, the ALJ determined that the limitations resulting from Pamela's hypertension were not as severe as alleged. (Id. at 24-25.) The ALJ's analysis demonstrates that he reasonably weighed the evidence, and this court cannot substitute its judgment for that of the ALJ's. *See Deborah M.*, 994 F.3d at 788.

Pamela further contends that the ALJ incorrectly indicated her sinusitis/rhinitis improved after surgery and her stroke symptoms improved after inpatient therapy. (R. 22, Pl.'s Br. at 14.) Again, the ALJ relied on medical records to support his decision. With respect to her May 2017 septoplasty and turbinate reduction for sinus issues, the ALJ noted that thereafter Pamela had "no nasal discharge, normal external nose, and no intracranial masses or polyps." (A.R. 23 (citing id. at 1118 (noting normal appearing nose, normal mucosa pink and moist,

16

and no oral lesions)).)  Although Pamela continued to report nasal congestion on one side, the ALJ observed her provider recorded noncompliance with nasal sprays. (Id.)  As to her stroke symptoms, the ALJ found they improved not only after inpatient therapy but also over time, such that her providers documented "normal gait, full upper and lower extremity motor and muscle strength, and intact sensation to the extremities."  (Id. at 21, 23-24 (citing id. at 416 (noting Pamela could walk more than 300 feet using no assistive device days after stroke), 797-98 (noting normal gait, no pronator drift, normal gross motor), 914 (noting normal motor and sensory and 5/5 upper and lower extremity strength), 1230 (noting Pamela had "improved much" since stroke").)

Finally, Pamela argues the ALJ erred in considering her activities of daily living.  (R. 22, Pl.'s Br. at 14-17.)  Despite alleging an inability to work, the ALJ noted that Pamela was able to "independently manage[] personal care needs, car[e] for her [aging] mother, prepar[e] simple meals, assist[] with household chores, grocery shop[], read[], go[] to the movies, participat[e] in outside activities, and bicycl[e]."  (A.R. 24-25.)  The ALJ described Pamela's performance of such activities as "somewhat normal."  (Id. at 24.)  Pamela contends the ALJ did not account for her limitations in performing such activities.  (R. 22, Pl.'s Br. at 15.).  For example, Pamela reported it took longer to bathe, cook, and shop because of left-side weakness.  (Id.)  But as discussed, the ALJ cited objective evidence that was inconsistent with such allegations.  Although Pamela claims that some activities she cited in her function report could be performed only before her stroke, (id. at

16), the ALJ's reliance on that report does not render his analysis invalid. "Not all of the ALJ's reasons [for discounting a claimant's symptom allegations] must be valid as long as *enough* of them are." *Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009) (emphasis in original). The ALJ here provided enough "specific reasons supported by the record" to support his assessment, and the court finds nothing "patently wrong" with it. *See Grotts*, 27 F.4th at 1279.

## C. Treating Physician Opinion

Nor did the ALJ fall short in assigning only "slight weight" to treating physician Dr. Sethi's opinion. Under the treating physician rule in effect at the time Pamela filed her disability claims, an ALJ must give controlling weight to a treating physician's opinion if it is: "(1) supported by medical findings; and (2) consistent with substantial evidence in the record."[3] *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). If the ALJ concludes that a treating physician's opinion is not entitled to controlling weight, he must give "good reasons" for discounting the opinion, after considering factors such as the nature of the treatment relationship, the frequency of examination, the physician's specialty, the type of tests performed, and the reliability of the opinion. *See* 20 C.F.R. § 416.927(c); *see also Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016).

Dr. Sethi reported that because of her stroke, Pamela had "weakness, slight paralysis, vertigo/dizziness, headaches, and mild left-sided hemiparesis." (A.R. 24

---

[3] The SSA has since adopted new rules for evaluating the opinions of treating physicians. *See* 82 Fed. Reg. 58844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017). Because the new rules apply only to disability applications filed on or after March 27, 2017, they do not apply here. (Id.)

(citing id. at 1240).)  She opined that Pamela's pain, fatigue, and symptoms were sufficiently severe "to interfere with attention and concentration occasionally" and that she was limited to work that permitted shifting positions at will.  (Id.)  The ALJ afforded Dr. Sethi's opinion only "slight weight" because he found it "inconsistent with the clinical findings."  (Id.)  Specifically, the ALJ noted the record evidence showing only "slight" residual effects of Pamela's stroke "with no significant and persistent disorganization of motor function."  (Id.)  Likewise, the ALJ recognized that Pamela's examinations show "only mild intermittent symptoms."  (Id.; see also id. at 23 (noting consultative examiner's finding that Pamela had no difficulty standing or sitting).)  And Dr. Sethi found that Pamela did not have significant and persistent disorganization of motor function in two extremities, which the ALJ noted was inconsistent with the opinion that Pamela needed to sit and stand at will.  (Id. at 24 (citing id. at 1240); see also id. at 20 (citing id. at 266 (Pamela's disability report listing "[m]ild stroke" as medical condition)), 24 (citing id. at 1240 (Dr. Sethi's opinion noting clinical findings of "mild left-sided hemiparesis")).)

Pamela argues the ALJ erred by not considering all of the required regulatory factors set forth in 20 C.F.R. § 404.1527(c), including "the length, frequency, nature, specialty, and extent of the treatment relationship, as well as its consistency and support in the record."  (R. 22, Pl.'s Br. at 18-19); *Stocks v. Saul*, 844 Fed. Appx. 888, 892 (7th Cir. 2021).  But the government is correct that the ALJ need not address every applicable factor under § 404.1517(c).  (R. 28, Govt.'s Mem.

at 6-7); *see Stocks*, 844 Fed. Appx. at 892. And here the ALJ addressed Dr. Sethi's treatment relationship, specialty, and her opinion's consistency with the record evidence. (A.R. 24 (noting Dr. Sethi was Pamela's treating "internist" and discussing opinion's "inconsisten[cy]").) Because the ALJ supplied a "good reason" for discounting Dr. Sethi's opinion—inconsistency between the opinion and record evidence—he did not err in declining to grant that opinion more weight. *Stocks*, 844 Fed. Appx. at 892.

## D.    Past Relevant Work

Finally, Pamela argues that the ALJ failed at step four "to make findings of fact about the demands of . . . past [relevant] work." (R. 22, Pl.'s Br. at 18-19.) But as the government points out, a VE testified at the hearing that a person with Pamela's RFC could perform work as a jewelry salesperson and nursery school attendant, as those jobs are typically performed at the light exertion level. (R. 28, Govt.'s Mem. at 12; A.R. 131-32.) And the ALJ relied on the VE's testimony in finding that Pamela could perform her past relevant work in those positions. (Id. at 25-26.) Nevertheless, Pamela contends that the ALJ's analysis was deficient because he "did not build a logical analytical bridge from his RFC limits" to his finding that she could perform past work as she actually performed those jobs, not just how they are generally performed. (R. 29, Pl.'s Reply at 9-10.) In so arguing, she relies on Seventh Circuit cases that, according to her, require the ALJ to "list the demands" of past relevant work and describe "the tasks the job[s] entailed."

(R. 22, Pl.'s Br. at 19 (citing *Nolen v. Sullivan*, 939 F.2d 516, 519 (7th Cir. 1991); *Prince v. Sullivan*, 933 F.2d 598, 602-03 (7th Cir. 1991)).)

The cases Pamela cites, however, are easily distinguishable because they involved step-four findings describing past work "based on their exertional level alone." *Patrick V.W. v. Saul*, No. 19 CV 1297, 2020 WL 7353443, at *6 (N.D. Ill. Dec. 15, 2020); *see also Cohen v. Astrue*, 258 Fed. Appx. 20, 28 (7th Cir. 2007) (finding *Nolen* inapplicable where ALJ considered specific jobs claimant performed). By contrast, here the VE described Pamela's past jobs as jewelry salesperson and nursery school attendant and, for each, provided Dictionary of Occupational Titles ("DOT") codes, physical demand levels (light), and skill levels (semi-skilled, SVP 4 and 5), as Plaintiff acknowledges. (R. 29, Pl.'s Reply at 10 (citing A.R. 128-32).) Accepting the VE's testimony, the ALJ found that "[i]n comparing [Pamela's RFC] with the physical demands of this work," Pamela "is able to perform some of her past relevant work as generally performed." (A.R. 25.) Having considered the specific jobs the VE identified, as they are usually performed, the ALJ supported his step-four determination with substantial evidence. *See Patrick V.W.*, 2020 WL 7353443, at *6; *Robertson v. Berryhill*, No. 17 CV 4034, 2018 WL 11088455, at *6 (N.D. Ill. Aug. 24, 2018) ("At step four the ALJ was not required to provide a more detailed description of [claimant's] past work nor was he required to further elaborate on her alleged limitations in performing the job."). The court thus finds no reason to remand on this ground.

## Conclusion

For the foregoing reasons, Pamela's motion for summary judgment is denied, and the government's is granted.

ENTER:

Young B. Kim
United States Magistrate Judge